# UNITED STATES DISTRICT COURT

### for the
### Middle District of North Carolina

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with the brandon@helpthemedia.com and info@helpthemedia.com email accounts

)
)
)
)
)
)

Case No. 1:20MJ166-1

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Eastern_____ District of _____Michigan_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | *Offense Description* |
|---|---|---|
| 18 U.S.C. § 1343 | Wire Fraud | |
| 18 U.S.C. § § 1956 and 1957 | Money Laundering | |

The application is based on these facts:
See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Alberto G. Sanabria
*Applicant's signature*

Alberto G. Sanabria, Postal Inspector, USPIS
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: __6/23/2020 5:15PM__

*Judge's signature*

City and state: __Durham, North Carolina__

Joe L. Webster, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | |
| INFORMATION ASSOCIATED WITH THE **BRANDON@HELPTHEMEDIA.COM** AND **INFO@HELPTHEMEDIA.COM** EMAIL ACCOUNTS | Case No. 1:20MJ166-1 <br><br> **Filed Under Seal** |
| THAT ARE STORED AT PREMISES CONTROLLED BY **A2 HOSTING, INC.** | |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Alberto G. Sanabria, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.     I am a United States Postal Inspector with the United States Postal Inspection Service ("USPIS"), and have been so employed for the past seven years. During this time, I have been assigned to the Financial Crimes team where my duties include the investigation of fraud-related criminal statutes, including, but not limited to, wire fraud and money laundering. I have received formal classroom training from the United States Postal Service Inspection Service ("USPIS") during the 12-week Postal Inspector Basic Training Academy in Potomac, Maryland. I have received formal instruction from U.S. Postal Inspectors as well as other federal, state, and local law enforcement agents who have done extensive work in the areas of mail theft, bank fraud, and identity theft. Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 pandemic. Based on my training and experience, I am familiar with the current method of

operation that individuals and groups are using to fraudulently solicit victims, via electronic mail and other means, to send money in exchange for financial assistance.

## STATUTES VIOLATED, PREMISES TO BE SEARCHED, AND PROPERTY TO BE SEIZED

2.     Based on the facts as set forth in this affidavit, I submit there is probable cause to believe that Brandon Rashad Lewis ("LEWIS"), president of Lewis Revenue Group, LLC ("LRG"), has committed violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1956 (Money Laundering), and 1957 (Engaging in Monetary Transaction in Property Derived from Specific Unlawful Activity) (collectively, the "SUBJECT OFFENSES").

3.     I submit that there is probable cause that evidence of the SUBJECT OFFENSES is contained in information associated with certain email accounts that are stored at premises controlled by A2 Hosting, Inc. (hereinafter "A2 Hosting" or the "Provider"), a multi-service web hosting company and email provider headquartered at 2000 Hogback Rd #6, Ann Arbor, Michigan 48105. The items to be searched are brandon@helpthemedia.com ("SUBJECT ACCOUNT 1") and info@helpthemedia.com ("SUBJECT ACCOUNT 2" and, together with SUBJECT ACCOUNT 1, collectively, the "SUBJECT ACCOUNTS"), which are also described in Attachment A.

4.     This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require A2 Hosting to disclose to the government copies of the information (including the content of communications) relating to email accounts further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

5.     Concurrent with this application, the government is seeking authority for two additional email search warrants under the aforementioned statutes, for which separate affidavits have been submitted.

6.     The facts and information in this affidavit are based upon my personal knowledge as well as the observations of other law enforcement agents and others involved in the investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## JURISDICTION

7.     This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## E-MAIL HOSTING PROVIDERS

8.     Email hosting providers offer services such as "mail exchange" or "MX" entry which delivers email for a domain to a different server than the one where the website itself is hosted.   For example, in this matter, the investigation revealed that Namecheap, Inc. dba Namecheap.com (hereinafter "Namecheap") hosts the domain names at issue while the following entities provide the email hosting services relating to those domains.

9.     A2 Hosting provides email hosting for the helpthemedia.com domain (the "HELP THE MEDIA DOMAIN"), including but not limited to the SUBJECT ACCOUNTS.

10.     Endurance International, through its subsidiaries, provides email hosting for the lrg-group.net and americanrelief.org domains, including the brandon@helpthemedia.com and info@helpthemedia email accounts.

11. Hawk Host Inc. provides email hosting for the. lewisrevenuegroup.com domain, including the brandon@lewisrevenuegroup.com and info@lewisrevenuegroup.com email accounts.

## PROBABLE CAUSE

### Probable Cause Summary

12. As set forth in greater detail below, there is probable cause to believe that LEWIS, who resides and has committed the acts described below in the Middle District of North Carolina, has committed violations of the wire fraud and money laundering statutes because, beginning in or around April 2020, LEWIS created a "COVID-19 Relief Fund" purportedly managed and overseen by LEWIS as president of LRG and with supposed funding from well-known corporations. Through targeted email marketing, Facebook ads, and other methods, LEWIS directed potential grant applicants to the "lewisrevenuegroup.com" website, which instructed applicants to fill out an application for the fund. LEWIS promised "guaranteed funds" of between $12,500 and $15,000 in exchange for an upfront "reservation fee" of between $995 and $1200, respectively. The April 2020 roll-out of LEWIS' COVID-19 Relief Fund coincided with—and took advantage of—small business owners' desperation in light of the challenges they faced seeking COVID-19 relief funds through official government programs. LEWIS encouraged potential grant applicants to research him and his fund, directing them to websites with purported news articles about LEWIS and the fund. However, the investigation suggests that these supposed news articles were largely either paid content likely financed by LEWIS or hosted on a website that LEWIS controlled. In the eleven days between April 16 and 27, 2020 alone, at least $112,040 from 113 individuals or entities was paid to LEWIS, nearly all of which included an invoice memo for "Obtain Relief Grant;" however, the government is not aware of any individuals or entities

who have received their funds. Moreover, in May 2020, LEWIS created another purported relief fund called the "American Relief Fund." LEWIS created a separate website, "americanrelief.org," through which he offered a $5,000 grant for individuals and small businesses. On the website, LEWIS claimed that the "American Relief Fund" was sponsored and funded by multiple, well-known corporations and even used trademarks and/or logos of those corporations. After speaking with law enforcement, at least three of the corporations have denied any affiliation with LEWIS or the American Relief Fund, and made clear that they did not grant LEWIS or LRG permission to use their intellectual property.

### The CARES Act

13.     In or around March 2020, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was enacted to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. The CARES Act established several new temporary programs and provided for expansion of others, including programs created and/or administered by the United States Small Business Administration ("SBA").

#### *The Economic Injury Disaster Loan Program*

14.     One source of relief provided by the CARES Act was the expansion of the SBA's existing disaster-related program, the Emergency Injury Disaster Loan ("EIDL"), which provides loan assistance for small businesses and other eligible entities through low interest loans of up to $2 million that can provide vital economic support to help overcome the temporary loss of revenue due to COVID-19. Additionally, as of the end of March 2020, the CARES Act authorized up to $10 billion in grants or "advances" of up to $10,000 each, to be provided within three days of a successful application and that did not need to be repaid. The EIDL Program does not require

payment of an upfront or "reservation" fee and does not "guarantee" funds to all who apply. In fact, during and shortly after the expanded EIDL Program roll out in early April 2020, it was widely reported that, although the grants of up to $10,000 were supposed to have been provided to small business owners within three days of successfully applying, "[d]emand for the EIDL loans and grants quickly overwhelmed the system, leaving many applicants without funds weeks later . . . .The SBA . . . ha[d] received well over 3 million applications [and] . . . [a] shortage of funds threaten[ed] to limit the size of grants and loans small businesses receive."[1]

### LEWIS Advertises the Purported "COVID-19 Relief Grant" and Fund through Targeted Email Marketing, Directing Small Business Owners to a Promotional Article on the Website "LewisRevenueGroup.com"

15.     On or about April 15, 2020, I reviewed a complaint filed by a small business owner located in New York ("Complainant 1"), regarding a suspicious email Complainant 1 received on or about April 13, 2020 from brandon@lewisrevenuegroup.com. The body of the email contained the following message:

> I contacted you through the chamber of commerce website. This email is very important. You have probably heard about the SBA's COVID-19 relief funds for small businesses. Many people are making a huge mistake on the SBA's application that completely disqualifies you from receiving funds. Read the article below to learn about this huge mistake:
> https://lewisrevenuegroup.com/relief-article.html.

The signature line at the end of the email listed Brandon Lewis as the president of LRG.

16.     On April 22, 2020, I received information about a second complainant ("Complainant 2") who also received an email from brandon@lewisrevenuegroup.com on or about

---

[1] Washington Post, April 15, 2020 *available at*
https://www.washingtonpost.com/business/2020/04/15/another-sba-program-is-severely-backlogged-running-low-funds/.

April 13, 2020, containing the same content. Complainant 2 is the executive director of a business in New York.

17.      Both Complainant 1 and Complainant 2 were able to provide email header information associated with the emails, which identifies the following Internet Protocol ("IP") address as being associated with the sender: 173.94.187.242.[2] As described in greater detail below, this IP address is linked to emails and phone numbers associated with LEWIS and LRG.

18.      The      email      hyperlink      embedded      on      both      emails— https://lewisrevenuegroup.com/relief-article.html—directed      users      to      a      webpage      within lewisrevenuegroup.com titled, "The Most Important Article You Can Read, Don't lose out on COVID-19 relief funds for your business." The website's author identified himself as "Brandon Lewis, President and Founder of investment firm Lewis Revenue Group." Moreover, the website purported to provide guidance on "how to receive a guaranteed $15,000 relief grant for your small business." The website also purported to provide information regarding SBA emergency relief grant and the "huge mistake" that purportedly disqualifies small business owners from receiving the SBA grant. In addition, the website stated that "the fund has up to $250 million available for small businesses (and up to $150 million for individuals)." A screenshot of the https://lewisrevenuegroup.com/relief-article.html webpage as it appeared on or about April 16, 2020, is attached hereto as Exhibit 1.

---

[2] The email header is a code snippet in a Hypertext Markup Language email, which contains metadata about the sender, recipient, IP address, email's route to get to the inbox, and various authentication details and enables investigators to, among other things, identify and trace the source of the email through its "IP Address," as was done here.

19.     The investigation has revealed that the lewisrevenuegroup.com domain is hosted by Namecheap. A review of the "Contact Us" section of the lewisrevenuegroup.com domain lists info@lewisrevenuegroup.com as the contact email address for inquiries. Records obtained from Namecheap reveal that LEWIS purchased and created the lewisrevenuegroup.com domain on July 12, 2019. The username on the account is listed as "Rushindo" while the user address, phone number, and email address associated with the domain have all been previously linked to LEWIS. Furthermore, the login history on the account related to user "Rushindo" shows the IP address 173.94.187.242 as the primary IP address used to login to Namecheap servers from May 2017 to May 2020. Records obtained from Namecheap also confirm that LEWIS purchased and created three additional domain names hosted by Namecheap, including: (i) the HELP THE MEDIA DOMAIN; (ii) lrg-group.net; and (iii) americanrelief.org. My review of LEWIS' Bank of America account records also reflect payments to Namecheap for these domain names during this time period.

**LEWIS Promises "Guaranteed" Funding In Exchange for an Upfront "Reservation Fee"**

20.     On his webpage "https://lewisrevenuegroup.com/relief-article.html," LEWIS instructed potential grant applicants "how to get a guaranteed $15,000 grant for your small business (in addition to the SBA grant)." LEWIS advised that small businesses can "purchase a reservation for $1200" to receive a grant through the COVID-19 Relief Fund. LEWIS stated that "[f]or all reservation holders, I will send you a link to the application as soon as the relief fund is open for applications, which is early next month." LEWIS went on to explain:

> Once the relief fund is open for applications, your reservation holds your $15,000 grant for 7 days. If you have a reservation you are guaranteed to be awarded the $15,000 grant as long as you submit your application within the first 7 days of the relief fund being open for applications.

...

> Grants will be dispersed via direct deposit beginning two weeks
> after the relief fund is open for applications. Everyone that is
> awarded a grant will receive an email that instructs you to be on the
> look out for a direct deposit at your bank.

21.     LEWIS explained that "[a]s the creator and administrator of this relief fund, I have

the sole power and authority to reserve grants for small businesses." LEWIS went on to guarantee

that "[e]very approved small business application will receive exactly $15,000. Unlike the SBA

grants, it doesn't matter how many employees you have. Everyone gets $15,000 if your application

is approved." LEWIS states that the grants are issued on a "first come first serve basis" and

cautions that "the grants [will] be gone within the first few hours of the relief fund being open for

applications."

22.     The website directed users to "purchase a reservation and lock in your $15,000

grant," through a link titled "click here." On April 16, 2020, I clicked on the link which directed

me to a secure "Square" checkout site that was non-operational at that time. Square, Inc.

(hereinafter "Square") is a financial services and payment processing company that allows

businesses to accept and receive credit card payments. From on or about April 16, 2020 to April

24, 2020, I periodically checked that particular Square checkout site and noticed the site remained

non-operational. Upon checking the site on or about April 25, 2020, I observed the Square

checkout link was active and listed the following information: "Lewis Revenue Group."

"Reservation for COVID-19 Relief Grant" and "$1,200," followed by fields that allowed a user to

enter an email address, full name, and credit card information. A screenshot of the Square

checkout site as it appeared on April 30, 2020, is attached hereto as Exhibit 2.

23.     The website further described how LEWIS is the creator and administrator of the relief fund, and has sole power and authority to reserve grants for small business owners and claimed: "[o]ur investment firm set up this COVID-19 relief fund!"

### LEWIS Falsely Touts that LRG and the COVID-19 Relief Fund are Affiliated with and Sponsored by Well-Known Corporations

24.     The webpage https://lewisrevenuegroup.com/relief-article.html also claimed that LRG "worked together with multiple corporations to organize the largest corporate funded COVID-19 relief fund to date." The website stated that "the fund has up to $250 million available for small businesses (and up to $150 million for individuals)."

25.     To persuade users "why you can trust me to provide 100% accurate information about this new relief fund" the website stated that LRG has been featured on websites such as USA Weekly, NBC News, CBS News, Boston Herald, Fox News, and Forbes. However, our investigation suggests that this purported news coverage was largely either paid content financed by LEWIS or hosted on a website that LEWIS controlled.

26.     On April 10, 2020, an article titled "New COVID-19 Relief Fund for Individuals and Small Businesses" appeared on "CBS19news.com." CBS 19 News is a licensed commercial television station based in Charlottesville, VA. Closer inspection of the CBS 19 News article reveals that it was actually a press release distributed by the independent third-party content provider, ABNewswire.com. ABNewswire is a press release distribution service where users can create their own press releases and have the press release distributed through a network of outlets, such as the CBS 19 News. Review of records obtained from PayPal reveal that, from 2017 to 2019, LEWIS paid ABNewswire approximately $400 for services listed as single press release distribution and monthly subscriptions for multiple press release distributions.

27.     Open source searches reveal that the same press release distributed by ABNewswire also appeared on at least the following three websites: WFXG Fox News in Augusta, Georgia; WRCB-TV in Chattanooga, Tennessee; and MarketWatch, a financial news outlet headquartered in New York, New York.

28.     The press release, also available on ABNewswire.com, announced the following information:

> The new COVID-19 relief fund is being funded by a group of corporations that have pooled funds. It is rumored that some of those corporations include AT&T, Exxon Mobil, General Motors, Home Depot and Target. The official list of corporate funders will be listed on the relief fund's website when it launches in the upcoming weeks. The relief fund was set up by Brandon Lewis, President of Lewis Revenue Group, an investment firm in North Carolina. Lewis also administers and oversees the relief fund.

The press release also contains a link directing users to the website "covid19grant.org" to complete the application. The press release lists the following information under "Media Contact:"

> Company Name: Lewis Revenue Group
> Contact Person: Brandon Lewis
> Email: brandon@lewisrevenuegroup.com
> Phone: 1 (888) 221-9073
> Country: United States
> Website: http://covid19grant.org

29.     On April 16, 2020, I reviewed the "covid19grant.org" website which listed the following information, "COVID-19 Relief Grant Coming Soon, Begin Application COMING SOON . . . ." Our investigation revealed that covid19grant.org is hosted by GoDaddy.com, LLC (hereinafter "GoDaddy"). Records obtained from GoDaddy reveal that LEWIS purchased and created the covid19grant.org domain on or about April 9, 2020. The address, phone number and email address associated with the domain have all been previously linked to LEWIS. Further,

LEWIS paid for covid19grant.org using a credit card bearing his name on a computer accessing the internet via the IP address 173.94.187.242, which has been linked to LEWIS.

30.     Further, through open source searches, I was unable to locate any information to suggest that the well-known corporations referenced in the press release — AT&T, Exxon Mobil, General Motors, Home Depot and Target — are, in fact, affiliated with LRG, LEWIS, or the COVID-19 Relief Fund.

31.     PayPal records also reveal that, since 2017, LEWIS has paid for press release services and used online digital platforms to facilitate the posting of press releases he is believed to have created on websites such as Forbes, Huffington Post, and USA Weekly. As an example, PayPal records show that on or about August 17, 2017, LEWIS paid the merchant "fiverr.com," an online freelance writing marketplace, $52.50 for services titled, "Write and publish your guest post on Forbes."

32.     Financial records also reveal a history of payments to numerous online services related to website "traffic bots." These traffic bots are known, in part, as non-human website traffic generators that create the impression that a website has more views than it really does. Additionally, payment records show that LEWIS conducted purchases on websites that sell fictitious or fabricated social media followers, "likes," and "views," to assist users with quickly building a social media profile. In my training and experience, individuals who engage in the use of these media to fabricate online presence are likely to do so in an effort to make their website or social media page—and underlying business—appear more popular or legitimate than it really is.

### LEWIS Advertises the Purported "COVID-19 Relief Fund" through Facebook Ads, Directing Small Business Owners to the Website "USAWeekly.com"

33.     On April 23, 2020, I learned of a complaint by a small business owner ("Complainant 3") regarding LEWIS and LRG. On April 15, 2020, Complainant 3 saw a Facebook

advertisement from "USA Weekly," which automatically directed Complainant 3 to the following webpage: "https://usaweekly.com/home/2020/04/14/guaranteed-12500-covid-19-relief-grant-for-small-businesses/." A review of this webpage shows it to be a USA Weekly press release written in the style of a news article claiming that small businesses can receive $12,500 or more through the COVID-19 Relief Fund offered by LEWIS listing LEWIS as an entrepreneur and president of LRG. It specifically states that LEWIS came up with the idea to assist small businesses with the relief fund and claims that the COVID-19 Relief Fund has at least $600 million in relief grants available for small businesses. In order for users to secure the $12,500 (or greater) grant—which does not need to be repaid—they must pay an upfront fee of $995.

34.     Complainant 3 subsequently emailed the contact associated with the USA Weekly advertisement to express interest in receiving the grant. Complainant 3 received an email response from the email address brandon@lrg-group.net, which has also been linked to LEWIS and LRG, as described in another affidavit filed concurrently today. That email promised to assist Complainant 3 with obtaining COVID-19 relief funds totaling $12,500 or more within 30 to 60 days. The email additionally stated that in order for Complainant 3 to receive the funds, a service charge of $995 would have to be paid through a Square payment link provided in the email. The signature line on the email identified the sender as "Brandon." The IP address found within the email header information of this email was also discovered to be 173.94.187.242 (*i.e.*, the same IP address that sent emails to other individuals, as described above in paragraph 17, which has been linked to LEWIS and LRG). As indicated above at paragraph 19, records from Namecheap reveal that LEWIS purchased and created lewisrevenuegroup.com on July 12, 2019.

35.     Complainant 3 responded to the email requesting to speak with someone over the phone about six small businesses Complainant 3 owned. On April 16, 2020, Complainant 3

received a phone call from (336) 558-2563 and spoke with an individual who identified himself as, and is believed to be, LEWIS. This is the same phone number that LEWIS provided to various service providers discussed herein, including Namecheap, GoDaddy, and Square, and which investigators also confirmed as being associated with LEWIS and LRG via a law enforcement database. LEWIS confirmed the $12,500 payments were guaranteed grants that did not have to be paid back and the $995 fee would be refunded if Complainant 3 did not receive the funds. LEWIS also stated he had access to non-profit organizations and major corporations that funded the account. LEWIS additionally told Complainant 3 that he secured funding from 32 corporations and had received grants for all of his small business owners due to his access and connections. LEWIS also advised that Complainant 3 could dispute the credit card charges if something went wrong.

36. Later that day, Complainant 3 emailed brandon@lrg-group.net with details related to the six businesses for which Complainant 3 wished to receive grants and LEWIS replied with an email containing six separate Square links containing invoices of $995 for each of the six businesses. A review of the Square payment invoices show the following terms:

> Lewis Revenue Group will obtain $12,500 or more in COVID-19 relief funds for client within 30 to 60 days. The funds will be obtained from corporations, foundations, and non-profits.[;]
> Lewis Revenue Group will apply for the relief funds on behalf of client. [;]
> These funds do NOT have to be paid back.[; and]
> If Lewis Revenue Group unsuccessful at obtaining at least $12,500 in COVID-19 relief funds within 30 to 60 days, client will receive a full 100% refund.

37. On or about April 17, 2020, Complainant 3, concerned about the statement that credit card charges could be disputed if the grants were not approved, emailed LEWIS asking for

references. LEWIS responded by sending Complainant 3 links to websites such as Forbes and USA Weekly.

38.     Complainant 3, who has a background in online marketing and social media, undertook to independently verify the legitimacy of LEWIS and LRG as well as the USA Weekly Facebook ad and website prior to filing a complaint with law enforcement. Complainant 3 provided investigators with records that show certain aspects of the USA Weekly Facebook page, such as the number of users or fans and the page owner, were fabricated to promote the USA Weekly website, including that the profile picture associated with the sole user of the USA Weekly Facebook page is a widely-used image and not unique to that user.

39.     As described previously in this affidavit, LEWIS' financial records show that he had previously paid for press release services and used online digital platforms to facilitate the posting of articles he is suspected of creating on USA Weekly. A WHOIS inquiry into the domain USAWeekly.com     (i.e.,     the     parent     domain     of     the     webpage https://usaweekly.com/home/2020/04/14/guaranteed-12500-covid-19-relief-grant-for-small-businesses/) reveals it to be a domain hosted by GoDaddy. GoDaddy records show that domain was registered by LEWIS on February 19, 2018. Additionally, GoDaddy records show the physical address of 3859 Battleground Ave., Greensboro, NC 27410 as being associated with this particular domain, which, as described below, was listed on the LRG website, but, is neither associated with LEWIS nor a real address.

**Lewis Revenue Group Is Not a Licensed Investment Firm or Charitable Organization**

40.     LewisRevenueGroup.com describes LEWIS' company as an "investment firm with a focus on the tech space," including software development and information technology services. The website additionally states that LRG, "provide[s] clients with, an array of municipal banking

and underwriting products. Through our financing strategies, client-centric modeling, credit analyses and a strong sales and trading platform, we help minimize the cost of borrowing and enhance debt flexibility." North Carolina state law requires that both financial institutions and entities offering insurance products be licensed in the state. A search of current North Carolina state-chartered bank and trust companies reveals that neither LEWIS nor LRG is a regulated financial institution in the state of North Carolina. Similarly, a search of the North Carolina Department of Insurance reveals that neither LEWIS nor LRG is licensed to provide insurance products in the state of North Carolina.

41.   The investigation further revealed that neither LEWIS nor LRG is registered in the state of North Carolina as an investment firm, as required by law. Searches in the records of the Financial Industry Regulatory Authority ("FINRA") and the United States Securities and Exchange Commission ("SEC"), further reveal that neither LEWIS nor LRG is registered as a member of FINRA, or as a registered Investment Adviser with the SEC, as is generally required for firms that manage more than $25 million. Open source searches for LEWIS and LRG show no independent confirmation that he or the corporation are a legitimate investment firm operating in North Carolina.

42.   The investigation also revealed that neither LEWIS nor LRG is registered in the state of North Carolina as a charity. Under North Carolina Law, any organization or person that intends to directly solicit contributions must register as a charity through the North Carolina Charities Division. A search of the North Carolina Charitable Solicitations and Licensing database revealed, however, that neither LEWIS nor LRG is registered to fundraise in North Carolina. Additionally, open source searches for LEWIS and LRG failed to show any confirmation (other than on LEWIS' own websites) that LEWIS, or LRG, are affiliated in any way with  sponsor or

benefactor    corporations    or    organizations       which,    according    to    the
https://lewisrevenuegroup.com/relief-article.html webpage, have donated or raised a total of $400
million.

### Contrary to Information on the LRG Website, LRG's Only Office Location is LEWIS' Current Residence

43.    LewisRevenueGroup.com identifies LRG's business address as 3859 Battleground
Avenue, Suite 206, Greensboro, NC 27410.  On April 17, 2020, I attempted to verify the business
was being operated at the 3859 Battleground Avenue location.  After being unsuccessful in
locating suite 206 for that address, I called the property manager for the business complex.  The
manager advised that suite 206 did not exist at the 3859 Battleground Avenue location.
Additionally, when asked if there were any tenants by the name of LEWIS or LRG, the manager
said there were no tenants at the business complex by those names.

### Analysis of LEWIS' Merchant and Personal Financial Accounts Revealed Significant Activity, Including More than 100 Payments of $995 and Associated with "Obtaining Relief Grant[s]" From April 15, 2020 to April 27, 2020

44.    Records obtained from Square show that LEWIS created a merchant account with
Square, account identification number 9PZH61WZG013X, on December 16, 2018, under the
business name "Lewis Revenue Group."  LEWIS linked his Square account to his Bank of America
("BOA") checking account ending in 4184 the same day.  Additionally, the Square account records
show that LEWIS listed SUBJECT ACCOUNT 1 as his primary email contact, together with the
name, date of birth, social security number, address, and phone number as all being linked to
LEWIS.  Account login records identify the IP address 173.94.187.242 as being the primary IP
address used to log into LEWIS' Square account.

45.    Analysis performed on LEWIS' Square account ending G013X found 113
payments made to LEWIS between April 15, 2020 and April 27, 2020 totaling $112,040.00

traceable to the COVID-19 Relief Fund scheme. Of these payments, 109 were in the amount of $995 and included the following invoice memo: "Obtain Relief Grant." Three additional payments in the amount of $995 did not include an invoice memo. One payment in the amount of $600 included the following invoice memo: "Obtain Relief Grant (Deposit to Hold Spot)." The timeframe, invoice amount, and/or invoice memo were consistent with indicators relating to the purported COVID-19 Relief Fund grant and associated "reservation fee" detailed by interviewed complainants and victims.

46.     Some of the invoice memos also listed the specific names of the businesses making the purchases. I discovered the invoices that listed the business names were associated with other Square invoices that were linked together through the same IP address. This is consistent with a customer who owns multiple businesses and submits several Square payments using the same computer, which would capture the same IP address. As previously referenced in this affidavit, Complainant 3 received six Square invoices each for $995 which listed each of the businesses under the invoice name. Similarly, the invoice name section of the Square records also listed the following businesses that were linked through the same IP address as seen below in Table 1.

**Table 1**

*Square Customer IP Address and Invoice Name Link*

| Date | IP Address | Invoice Name |
|------|-----------|--------------|
| 4/20/2020 | Ending 108.18 | Obtain Relief Grant for Business 1 |
| 4/20/2020 | Ending 108.18 | Obtain Relief Grant for Business 2 |
| 4/20/2020 | Ending 108.18 | Obtain Relief Grant for Business 3 |
| 4/20/2020 | Ending 108.18 | Obtain Relief Grant for Business 4 |
| | | |
| 4/22/2020 | Ending 135.159 | Obtain Relief Grant for Business 5 |
| 4/22/2020 | Ending 135.159 | Obtain Relief Grant for Business 6 |
| | | |
| 4/22/2020 | Ending 229.178 | Obtain Relief Grant for Business 7 |
| 4/22/2020 | Ending 229.178 | Obtain Relief Grant for Business 8 |
| | | |

| 4/23/2020 | Ending 191.54 | Obtain Relief Grant for Business 9 |
| 4/23/2020 | Ending 191.54 | Obtain Relief Grant for Business 10 |

As part of the investigation, I have undertaken to identify and interview the victim business owners listed above who have submitted payments to LEWIS through Square.

### *Victim 1*

47.   On June 3, 2020, I interviewed the victim who paid the above Square invoices associated with Businesses 1 through 4 on April 20, 2020 ("Victim 1"). Victim 1 is the principal owner of Business 1 and Business 2. Victim 1's relative is the principal owner of Business 4 and a second relative is the principal owner of Business 3. Business 1, 2, 3 and 4 are each located outside of North Carolina in Ohio. Victim 1 advised that the second relative sent Victim 1 the same USA Weekly website link previously mentioned in paragraph 33 of this affidavit. Victim 1 stated the USA Weekly article contained information about guaranteed grants of $12,500 for small businesses that did not have to be repaid. Victim 1 also mentioned the article stated the $995 fee to apply for the grants, which would be funded by major corporations, would be refunded if the applicant did not receive the grants.

48.   Victim 1 reviewed the information on the website and subsequently conducted online research on LEWIS and the COVID-19 Relief Fund to confirm the legitimacy of the grant. LEWIS' significant online presence as well as his representation as being a legitimate business owner influenced Victim 1's decision to apply for the grants.

49.   On April 20, 2020, LEWIS corresponded with Victim 1 via brandon@lewisrevenuegroup.com, stating:

> Since you contacted us, it is safe to assume you understand a little about what we are doing to help small businesses. In a nutshell, if you have 500 employees or less, we can help you obtain COVID-19 relief funds from corporations/foundations totaling $12,500 or more within 30 to 60 days. Even sole proprietors and independent

contractors are eligible. These funds do NOT have to be paid back. These are not loans. No minimum revenue requirements. We charge $995 for this service. Once payment is made, we will email you a form to complete with information about your business. Once the form is completed, we will take care of everything from there and apply for the funds with corporations/foundations. Once you have been awarded the relief funds, we will contact you and let you know. We offer a full money back guarantee if you don't receive at least $12,500 in relief funds within 30 to 60 days. As you have mentioned, we have been bombarded with emails after several news outlets featured us, therefore we are only accepting a few more clients. If you would like to move forward, please let me know and send me your full name and company name. I will send you an invoice that includes all the terms. You mentioned having several companies/non-profits. We can secure relief funds for them all, though you will be billed separately for each organization.

50.     Victim 1 authorized LEWIS to proceed and LEWIS emailed Victim 1 four separate Square invoices for each of the businesses. Victim 1 made four payments of $995.00 to LEWIS via credit card the same day.

51.     Victim 1 also advised that each of the four businesses, which have been grossly impaired as a result of COVID-19 restrictions, would be severely damaged if they did not receive the promised grant funding or refund of the application fees. As of June 16, 2020, Victim 1 had not received the promised Covid-19 Relief Grant funds, or a refund.

### *Victim 2*

52.     On June 4, 2020, I interviewed an individual located in Michigan ("Victim 2"). Victim 2, co-owner of Business 9 and 10, paid the above Square invoices associated with those businesses on April 23, 2020. On or about April 20, 2020, Victim 2 saw an article on Facebook that Victim 2 believed to be from the USA Today publication. Victim 2 recalled the advertisement listed information about guaranteed grants of $12,500 for small businesses. The advertisement additionally promised applicants a money back guarantee for the initial application fee of $995.

53.     After reviewing the advertisement, Victim 2 independently researched the company mentioned in the advertisement, LRG. Victim 2 emailed LEWIS on or about April 20, 2020, at brandon@lewisrevenuegroup.com regarding Victim 2's interest in obtaining a grant. LEWIS responded from brandon@lrg-group.net and described details of the grant. Victim 2 requested assurances from LEWIS that Victim 2 would not get "ripped-off" and, in response, LEWIS emailed a link to a USA Weekly article describing the COVID-19 Relief Fund. Victim 2 mistook the USA Weekly article for the newspaper publication, USA Today, which Victim 2 believed lent LRG legitimacy and factored into Victim 2's decision to pay the $995 "reservation fee" for Business 9 and 10.

### Analysis of LEWIS' Financial Records Reveals Transfer of Likely Victim Funds into LEWIS' Bank of America Accounts

54.     On April 28, 2020, I received records from BOA related to three accounts held by LEWIS. The signature card for BOA business account 237035544184 shows the account title listed as "DBA LEWIS REVENUE GROUP" and "BRANDON LEWIS SOLE PROP." The signature line, dated December 28, 2016, identifies LEWIS as "President." On that same day, LEWIS also opened business savings account 237035544197 and used the same account title as the checking account. LEWIS provided his North Carolina Driver's License bearing #26677686 to open both accounts. Additionally, BOA records revealed that on October 28, 2019, LEWIS opened a third BOA account, business checking account 237041857577, in the name of "LEWIS REVENUE GROUP L.L.C." Furthermore, the login history for LEWIS' accounts show that he accessed the BOA website to log into his account from an electronic device with the IP address 173.94.187.242.

55.     Analysis performed on the Square account ending G013X and LEWIS' BOA account ending in 4184 confirms that, between April 17 and 27, 2020, of the 113 Square payments

made by likely victims, 106 of those payments totaling $105,470 were transferred from the Square account into LEWIS' BOA account ending in 4184. Additionally, records show that Square grouped the 106 individual Square payments made by customers related to the Covid-19 Relief Fund into eleven separate transfers, minus the Square fee (approximately 2.9%), and transferred the net amount into LEWIS' BOA account ending in 4184. Table 2 below shows the eleven Square transfers, date of activity, estimated Square fee conversion, and net amount transferred to LEWIS' BOA account.

**Table 2**

*Summary of Aggregated Square Transactions and Net to BOA 4184*

| Date of Activity | Original Amount | Estimated Conversion Rate | Net Amount to Bank Account | No. of Payments |
|---|---|---|---|---|
| 4/15/20-4/16/20 | $11,940.00 | 0.970693 | $11,590.08 | 12 |
| 4/18/20-4/19/20 | $7,960.00 | 0.970693 | $7,726.72 | 8 |
| 4/18/20-4/19/20 | $7,960.00 | 0.970693 | $7,726.72 | 8 |
| 4/19/20-4/20/20 | $4,975.00 | 0.970693 | $4,829.20 | 5 |
| 4/20/20 | $17,910.00 | 0.970693 | $17,385.12 | 18 |
| 4/21/20-4/22/20 | $9,950.00 | 0.970693 | $9,658.40 | 10 |
| 4/22/20 | $7,960.00 | 0.970693 | $7,726.72 | 8 |
| 4/22/20-4/24/20 | $20,895.00 | 0.970693 | $20,282.64 | 21 |
| 4/24/20-4/25/20 | $11,940.00 | 0.970693 | $11,590.08 | 12 |
| 4/26/20-4/27/20 | $2,985.00 | 0.970693 | $2,897.52 | 3 |
| 4/27/20 | $995.00 | 0.970693 | $965.84 | 1 |
| **TOTAL** | **$105,470** | | **$102, 379.04** | **106** |

56.     A detailed examination of these records shows that LEWIS used monies obtained in connection with the COVID-19 Relief Fund for personal expenses. Between April 15, 2020 and April 16, 2020, for example, LEWIS received twelve separate incoming payments of $995 from customers paying invoices through Square. Ten of the twelve payments list "Obtain Relief

Grant" as the invoice name. The aggregate amount for all twelve transactions, $11,940, was then reduced by the aforementioned conversion rate of 0.970693 to account for the Square transaction fee. The net amount, $11,590.08, was then transferred to LEWIS' BOA account ending in 4184 on 4/17/2020 at 7:12 AM. A review of LEWIS' BOA account ending in 4184 shows that on the same day he received the incoming Square transfer, he used the BOA debit card associated with the account ending in 4184 to purchase twenty-two $500 gift cards worth $11,000 and $1,000 in the form of a "cash back" at a Lowe's Home Improvement Store (hereinafter "Lowe's") located at 3001 Battleground Avenue, Greensboro, NC 27408. These gift cards are usable in a manner similar to cash.

57.     On May 29, 2020, I contacted Lowe's investigators regarding the above-mentioned gift card purchases. Video surveillance from the Lowe's located at 3001 Battleground Avenue, Greensboro, NC 27408 on April 17, 2020, shows a white Dodge Charger, with a distinct paint scheme and custom parts, pull into the parking lot. A black male matching LEWIS' description exits the vehicle, enters the store, and walks up to a Lowe's cashier. The video shows the individual believed to be LEWIS hand the cashier what appears to be several Lowe's gift cards. The individual believed to be LEWIS produces an identification card and a credit card to pay for the gift cards. The video additionally shows the individual believed to be LEWIS purchase the gift cards in three separate transactions. The date and time indicated on the surveillance video is consistent with Lowe's transactions records associated with purchases made on LEWIS' debit card associated with the BOA account ending 4184.

58.     Records from the North Carolina Department of Motor Vehicles ("NCDMV") show that LEWIS has a white Dodge Charger vehicle bearing North Carolina tag HDT-1302 registered in his name. Between April 24, 2020 and June 9, 2020, I conducted surveillance at

LEWIS' residence on numerous occasions. I repeatedly observed a white Dodge Charger, bearing North Carolina tag HDT-1302, parked in the front parking lot of the apartment complex. Additionally, LEWIS' white Dodge Charger bears the exact same paint scheme and custom parts as the Dodge Charger seen on the Lowe's Home Improvement video surveillance.

59.     Based on information provided by Lowe's, at least one of the gift cards was redeemed at a Lowe's store in Winston Salem, North Carolina, on or around April 21, 2020. Video surveillance records associated with the gift card transactions show the individual redeeming the gift cards as an older white male, which does not match LEWIS's description.

60.     In my training and experience, individuals who receive money related to a business transaction and immediately use the funds to purchase numerous gift cards in smaller value increments over several transactions usually do so in an effort to circumvent Bank Secrecy Act reporting requirements, and ultimately sell the gift cards at a discounted rate to receive cash in order to conceal the origin of the funds.

61.     Analysis of bank records from April 17, 2020 and April 27, 2020, (*i.e.*, the period of incoming Square transactions described in paragraph 55 reveals that LEWIS executed seven online banking transfers from his BOA account ending in 4184 to his BOA account ending in 7577, totaling $75,000. *See infra* at Table 3.

**Table 3**

*LEWIS' Bank Transfers between BOA Accounts 4184 and 7577*

| Square to BOA Account 4184 | | | Transfers from BOA 4184 to 7577 | |
|---|---|---|---|---|
| Date | Amount | | Date | Amount |
| 4/17/2020 | $11,590.08 | | | |
| 4/20/2020 | $7,726.72 | | | |
| 4/20/2020 | $7,726.72 | | | |
| 4/20/2020 | $4,829.20 | | 4/20/2020 | $18,000.00 |
| 4/21/2020 | $17,385.12 | | 4/21/2020 | $18,000.00 |
| 4/22/2020 | $9,658.40 | | 4/22/2020 | $7,000.00 |
| 4/23/2020 | $7,726.72 | | 4/23/2020 | $9,500.00 |
| 4/24/2020 | $20,282.64 | | 4/24/2020 | $15,500.00 |
| 4/27/2020 | $11,590.08 | | 4/27/2020 | $4,000.00 |
| 4/27/2020 | $2,897.52 | | 4/27/2020 | $3,000.00 |
| 4/27/2020 | $965.84 | | | |
| **Total** | **$102,379.04** | | **Total** | **$75,000.00** |

62.     As previously detailed, between April 17, 2020 and April 27, 2020, a total of $105,470.00 was debited from the Square account ending G013X and credited to BOA 4184 (less fees). Of those funds, $75,000.00 was transferred from BOA ending 4184 to BOA ending 7577. As of the through date of available financial records, traced funds attributed to the COVD-19 grant scheme were $6,570.00, $27,379.00, and $75,000.00 between G013X, BOA ending 4184, and BOA ending 7577, respectively. *See infra* at Table 4.

**Table 4**

*Trace Summary of COVID-19 Grant Fees*

| Date Range | Payments to Square G013X | Transferred from Square G013X to BOA 4184 | Transferred from BOA 4184 to BOA 7577 |
|---|---|---|---|
| April 15, 2020 to April 27, 2020 | $112,040.00 | | |
| April 17, 2020 to April 27, 2020[3] | ($105,470.00) | $102,379.04 | |
| April 20, 2020 to April 27, 2020[4] | | ($75,000.00) | $75,000.00 |
| **Traced Balance** | **$6,570.00** | **$27,379.04** | **$75,000.00** |

## In May 2020, LEWIS Created a New Website — "AmericanRelief.org" — Purporting to Offer Corporate-Sponsored Covid19-related Small Business Grants of $5,000

63.     On May 13, 2020, I discovered that the covid19grant.org website was automatically redirecting visitors to the website americanrelief.org. A review of Namecheap records reveals that americanrelief.org is hosted by Namecheap and was created by LEWIS on May 3, 2020. The website lists the title "American Relief Fund" just above the following statement: "$5,000 grants for every American affected by COVID-19 (until the funds run out)," as shown in Image 1 below. The website additionally lists the following corporations underneath the heading, "Funded by Franchisees of America's Largest Corporation[s]": McDonald's, Subway, Re-Max, The UPS Store, GNC, H&R Block, Papa John's, and Planet Fitness, and contains well-known logos and/or trademarks of each such corporation, as shown in Image 2 below. A screenshot of AmericanRelief.org as it appeared on May 13, 2020, is attached hereto as Exhibit 3.

---

[3] A detailed summary of transactions from April 17 to April 27, 2020, is provided in Table 2..

[4] A detailed summary of the transactions from April 20 to April 27, 2020, is provided in Table 3.

**Image 1**



**Image 2**



As previously mentioned in paragraph 28, Lewis made similar claims regarding corporations funding the first small business COVID-19 Relief Fund. LEWIS' purchase of americanrelief.org on May 3, 2020, offering $5000.00 in relief grants coincided with the $10 Billion in the SBA's available EIDL advance grant funds of up to $10,000 each running out on or about May 8, 2020.

64. A review of the "Frequently Asked Questions" section of the americanrelief.org website makes reference to two email addresses associated with the domain: (1) hello@americanrelief.org and (2) media@americanrelief.org. Specifically, the website lists the following information pertaining to these emails:

> Be sure to add hello@americanrelief.org to your contact list so that our email notifications do not go to the spam/junk email folder[;]

> You can contact us by sending an email to hello@americanrelief.org.[;]

> For media inquires, including interview requests with franchisees who helped fund the American Relief Fund, please email us at media@americanrelief.org.

65. On May 14, 2020, I contacted legal counsel for Planet Fitness World Headquarters, a franchisor of health gymnasiums through the United States, regarding claims made on americanrelief.org about Planet Fitness and any involvement the corporation may have with LEWIS. Planet Fitness legal counsel responded by stating that they have no affiliation with LEWIS or the americanrelief.org website.

66. On May 22, 2020, I contacted representatives with The UPS Store, a franchisor of retail shipping and business service centers, regarding claims made on americanrelief.org about The UPS Store and any involvement the corporation may have with LEWIS. Representatives with The UPS Store confirmed the organization has never heard of the americanrelief.org or LEWIS. Representatives additionally advised that the americanrelief.org organization is not supported by

The UPS Store and any claims made by the americanrelief.org website and LEWIS are therefore false and misleading.

67.     On June 3, 2020, I received a complaint referral regarding americanrelief.org. The complainant ("Complainant 4") advised that the apartment complex where he/she resides sent emails to tenants advising that the website americanrelief.org is providing individuals with COVID-19 relief grants. I subsequently called a management representative with the apartment complex who advised that the property manager ("Property Manager") sent the email to the tenants of numerous apartment complexes managed by Property Manager.

68.     On June 8, 2020, I spoke with Property Manager who recalled viewing an article from USA Weekly that discussed the fund and provided me with the following link to the article: "https://usaweekly.com/home/5000-emergency-grants-available/." A review of this website reveals it to be titled, "$5,000 Emergency Grants for Every American." The article, which contains a press release date of May 30, 2020, provides information on how individuals can receive a $5,000 emergency grant. Furthermore, the article lists the following corporations as joining together to provide funding for the program: McDonald's, Re-Max, The UPS Store, Planet Fitness, Subway, Papa John's, H&R Block, and GNC. The article additionally contains hyperlinks that direct users to the americanrelief.org website in order to apply for the grant. As a result of the USA Weekly article and Property Manager's inability to find any concerning or negative information related to the website, Property Manager decided to forward the link to tenants who, Property Manager believed, could benefit from receiving a grant such as the one promised on americanrelief.org.

69.     On June 12, 2020, I received another complaint referral regarding the website americanrelief.org. The complainant, who works in the legal department of the McDonald's Corporation ("Complainant 5"), advised that the website americanrelief.org, which purports to

provide individuals with "American [Relief] Funds," falsely claims sponsorship by McDonald's. Furthermore, the website lists the following quote purportedly from a McDonald's franchise owner/operator:

> I'm glad I was contacted to help fund the American Relief Fund. If you are in need of relief funds, I recommend you apply as soon as you can
> SAM GERBER, MCDONALD'S OWNER

70.     Complainant 5 was subsequently contacted by law enforcement for additional information. Complainant 5 stated McDonald's Corporation is not sponsoring a COVID-19 grant fund with americanrelief.org or otherwise. Further, McDonald's Corporation has no record of a current or former owner/operator by the name of "Sam Gerber" as quoted on behalf of McDonald's on the americanrelief.org website. McDonald's Corporation legal team has sent a demand letter to the ISP hosting americanrelief.org, Namecheap, to have the website shut down for misusing the McDonald's "Golden Arches" trademark to perpetrate a fraud on consumers.

## In June 2020, after Being Contacted by Law Enforcement, LEWIS Contacts Victims Regarding Potential Refunds

71.     On June 11, 2020, Victim 1, who is referenced in paragraphs 47-51, contacted me about receiving the following email from brandon@lrg-group.net:

> We have a final update. You will be receiving only $3,000 in relief funds for each company. This is due to the large number of people that requested funds. Therefore everyone is receiving less. As promised you are entitled to a full refund. Even though you will be refunded, you will still receive the $3,000 in grant funds.
> I will disclose the name of the fund once everything is finalized. Will also inform you when the grant will be dispersed.
> Regarding the refund, you have two options:
> 1) Our credit card company can process the refund. The issue is that it can take 10 to 14 days to show up in your account.
> 2) You can call your bank/credit card company and request the funds be returned due to "service not delivered." You will immediately receive your funds rather than waiting 10 to 14 days. The bank will also immediately withdraw the funds from our account. We have to

pay a "chargeback fee" but we are willing to eat that cost for the
sake of you getting your funds back immediately.
Which option do you prefer?

LEWIS sent the email to Victim 1 less than 48 hours after I attempted to interview him at his

residence and the day after he emailed me at my official ".gov" email address regarding the same.

In my training and experience, individuals who attempt to negotiate with victims in a scheme after

being contacted by law enforcement typically understand that they have acted dishonestly and seek

to obfuscate their conduct and/or "buy" time by portraying themselves, and the scheme, as being

legitimate.

     72.    I was additionally contacted by Victim 2, who is referenced in paragraphs 52 and

53 and who stated that on June 11, 2020, LEWIS sent Victim 2 the exact same email above from

the brandon@lrg-group.net email account.

## BACKGROUND CONCERNING EMAIL

     73.    Based on my training and experience, individuals who execute online schemes

involving victims conducting online payments rely heavily on communicating details of the

scheme with victims via email. This affidavit has addressed the following email correspondence

between LEWIS and victims/complainants, as well as email addresses linked to the scheme, which

show how LEWIS used email addresses (organized by domain) to further the scheme:

    a.  The lewisrevenuegroup.com domain: Between the dates of April 15, 2020 and
       April 22, 2020, Complainant 1 and 2 received an email from the
       brandon@lewisrevenuegroup.com email account regarding information on the
       COVID-19 relief fund as well as the https://lewisrevenuegroup.com/relief-
       article.html webpage. Victim 1 and 2 initially made contact with LEWIS through
       this same email address. This email address is also listed on the press releases
       associated with ABNewswire and several other news sources. Additionally,
       LEWIS listed the info@lewisrevenuegroup.com as the contact email address for
       inquiries on the LRG homepage.

    b.  The lrg-group.net domain: Between the dates of April 23 and June 11, 2020, Victim
       1, Victim 2, and Complainant 3 sent and received numerous emails to and from the

brandon@lrg-group.net email account related to the scheme, which, in the case of Victim 1 and 2 resulted in a financial loss for both victims.

c.    The HELP THE MEDIA DOMAIN: Square records link LEWIS' Square account with SUBJECT ACCOUNT 1. Additionally, LEWIS listed the SUBJECT ACCOUNT 2 as the contact email address for inquiries on the helpthemedia.com homepage.

d.    The americanrelief.org domain: the "Frequently Asked Questions" section of the americanrelief.org website make reference to the following email addresses associated with americanrelief.org: hello@americanrelief.org and media@americanrelief.org.

74.    Based on my experience and following guidance I sought and received from a team of two Special Agent-Computer Investigative Specialists (the "SA-CIS Team") with Internal Revenue Service Criminal Investigation, I know that domain hosting and email hosting are often provided by different companies. The SA-CIS Team also traced LEWIS's website domains lewisrevenuegroup.com, lrg-group.net, helpthemedia.com, and americanrelief.org to each of the companies providing email hosting. This was completed through a reverse domain name search from the website domain and allowed me to identify both mail exchange servers associated with the email addresses as well as the owners of those mail exchange servers.

75.    A domain name search of helpthemedia.com identified mail exchange server mail.helpthemedia.com(0). A domain name search of the mail exchange server provided the IP address 70.32.23.50. A WHOIS search for this IP address provided information for A2 Hosting, Inc. (A2HOS) located in Ann Arbor, MI.

76.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information

may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

77. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

78. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because, among other things, the information can be used to identify the account's user or users as well as victims or complainants.

## CONCLUSION

79.     Based upon my training and experience and the investigation described above, I submit that there is probable cause to believe that LEWIS has violated the criminal statutes listed above and that evidence, fruits, and instrumentalities of these crimes as described in Attachment B are stored at premises controlled by A2 Hosting, described in Attachment A.  Because the warrant will be served on A2 Hosting, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

80.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,


/s/ Alberto G. Sanabria
Alberto G. Sanabria
Postal Inspector
United States Postal Inspection Service


In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 23rd day of June, 2020, at 5:15p.m.


Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

## ATTACHMENT A

### Property to Be Searched

This warrant applies to all information associated with brandon@helpthemedia.com ("SUBJECT ACCOUNT 1") and info@helpthemedia.com ("SUBJECT ACCOUNT 2" and, together with SUBJECT ACCOUNT 1, collectively, the "SUBJECT ACCOUNTS") that are stored at premises owned, maintained, controlled or operated by A2 Hosting, Inc. (hereinafter "A2 Hosting" or the "Provider"), a company headquartered at 2000 Hogback Rd #6, Ann Arbor, Michigan 48105.

## ATTACHMENT B

### Particular Things to be Seized

**I.  Information to be disclosed by A2 Hosting, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on June 17, 2020, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.  The contents of all emails associated with the account beginning on January 1, 2020, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.  All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.  The types of service utilized;

d.  All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.        All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and

f.        For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

**The Provider is hereby ordered to disclose the above information to the government within FOURTEEN DAYS of the issuance of this warrant.**

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, instrumentalities, and proceeds of violations of 18 U.S.C. § 1343 (Wire Fraud), § 1956 (Laundering of Monetary Instruments), and § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), involving BRANDON RASHAD LEWIS and occurring on or after January 1, 2020, including, for the domain listed in Attachment A, in the form of the following:

a.    Communications between LEWIS and co-conspirators, vendors, financial institutions, potential victims, and others, related to the violations described above;

b.    Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

c.    Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

d.    Evidence related to financial transactions relating to the SUBJECT OFFENSES;

e.    Evidence of concealment of the SUBJECT OFFENSES;

f.    The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

# EXHIBIT 1



# The Most Important Article You Can Read

Don't lose out on COVID-19 relief funds for your business.

Case 1:20-mj-00166-JLW   Document 1   Filed 06/23/20   Page 42 of 57

# I will share with you two things...

1) How to receive a **guaranteed $15,000 relief grant** for your small business from a new COVID-19 relief fund.

2) The huge mistake that completely disqualifies you from receiving the SBA's emergency relief grant of up to $10,000.

# First, who am I?

My name is Brandon Lewis, President and Founder of investment firm Lewis Revenue Group. I was one of the first individuals to make an announcement about the SBA's emergency relief grants for small businesses.

Forbes magazine interviewed me on March 17th about the SBA relief grants:

**Forbes**     Billionaires   Innovation   Leadership   Money   Business   Small Business   Lifestyle

To help you understand more about one of the government's bailout packages, I spoke with Brandon Lewis, President of Lewis Revenue Group, an investment firm in North Carolina. "Every small business in the United States has the opportunity to receive a grant up to $10,000 from the government to help soften the blow of the pandemic," says Lewis. "This money will not have to be paid back. To be considered for the grant, you first have to apply for the SBA's Economic Injury Disaster Loan (EIDL). The up to $10,000 grant is technically an 'advance' on the loan you are applying for. You can receive the advance whether or not you are approved for the loan. And it does not have to be paid back."

Click here to read the full article on Forbes. In addition to Forbes, I have been featured on Inc, Fortune, Business Insider, and many other major business publications.

Now enough about me. Let's talk about you.

First, I will discuss the huge mistake that completely disqualifies you from receiving the SBA's emergency relief grant of up to $10,000. Secondly, I will discuss a guaranteed way to receive a $15,000 relief grant for your small business from a new COVID-19 relief fund.

Case 1:20-mj-00166-JLW   Document 1   Filed 06/23/20   Page 44 of 57

# The huge mistake that disqualifies you from getting the SBA Grant

I'm sure by now you have heard about the SBA's small business grant for up to $10,000. Hopefully you have already submitted an application. On Friday, April 11 the SBA began depositing grants into bank accounts, which is wonderful news.

Here is the huge mistake that a lot of small businesses are making…

There is a section on the application where you enter your bank account information. Since the application did not specifically ask for the name on the bank account, many people assume they can enter any bank account they want.

Wrong.

People are using bank accounts where the name on the account is registered to spouses, partners, parent companies, etc. This is a big mistake. The name on the bank account must match either 1) the name of the company on the application, or 2) the first and last name of the owner

Case 1:20-mj-00166-JLW   Document 1   Filed 06/23/20   Page 45 of 57

of the business on the application. If there is no match, you will NOT receive the grant funds. Your grant deposit will be rejected.

Below are a few examples of instances where people are making this huge mistake:

**Instance #1** - A husband completes the application using his own information, but enters his wife's bank account information. If the husband's name is not on his wife's bank account, the grant deposit will be rejected.

**Instance #2** - A CPA completes the application on behalf of his/her client and uses the client's information on the application. The CPA enters their own bank account information with the ultimate goal of forwarding the funds to their client. Big mistake. The grant deposit will be rejected.

**Instance #3** - A parent company called ABC Parent Company owns multiple businesses. The parent company applies for grants for each individual business it owns, using information for each business on the application. The parent company's bank account information is submitted on each application. The grant deposit will be rejected.

In summary, when applying for the emergency grant from the SBA, make sure the name registered to the bank account you submit matches either 1) the name of the company on the application, or 2) the first and last name of the owner of the business on the application.

If you made the mistake I described above, go re-submit your application ASAP. The SBA will use the information on your most recent application. Understand that if you have to re-apply, it will push you to the back of the line.

The last thing I want to mention about the SBA grant is this. The SBA emergency relief grant is not guaranteed to be $10,000 for every small business. The grants are based on your number of employees. You get $1,000 for each employee. So if you have 2 employees, you get $2,000.

Don't be shocked if you don't get the full $10,000 if you have less than 10 employees. If you already applied and you didn't make any mistakes, keep checking your bank account. The SBA began depositing grants on Friday, April 11.

# Guaranteed $15,000 relief grant from a brand new COVID-19 relief fund

Case 1:20-mj-00166-JLW   Document 1   Filed 06/23/20   Page 47 of 57

Pay close attention.

I am about to show you how to get a guaranteed $15,000 grant for your small business (in addition to the SBA grant). Since the COVID-19 pandemic began, corporations have been launching their own COVID-19 relief funds, such as Visa, Wells Fargo, Facebook and Sony.

There is a brand new COVID-19 relief fund for small businesses that is being funded by multiple corporations. The corporations are combining their funds to create one of the largest corporate funded COVID-19 relief funds to date.

Every approved small business application will receive exactly $15,000. Unlike the SBA grants, it doesn't matter how many employees you have. Everyone gets $15,000 if your application is approved.

The fund has up to $250 million available for small businesses (and up to $150 million for individuals). The grants are awarded on a first come first serve basis.

Here is why you can trust me to provide 100% accurate information about this new relief fund: **Our investment firm set up this COVID-19 relief fund!**

Our company, Lewis Revenue Group, worked together with multiple corporations to organize the largest corporate funded COVID-19 relief fund to date. You can read about it on USA Weekly, NBC News, CBS News, The Boston Herald, Fox News, and more.

In a nutshell, the fund is open to every small business in the United States with less than 200 employees. The fund will be open for applications early next month.

The $15,000 grants are awarded on a first come first serve basis. We expect the grants to be gone within the first few hours of the relief fund being open for applications.

Over 87 media outlets are lined up to write about the new relief fund as soon as it is open for applications, including The New York Times, The Wall Street Journal, CNN, TODAY Show, USA Today, The Washington Post, etc.

# How to guarantee yourself $15,000 for your small business

I am allowing a very small number of businesses to purchase a reservation to receive a grant. With this reservation, a $15,000 grant will be reserved for you until you submit your application early next month.

You are guaranteed a $15,000 grant, as long as you have 200 employees or less.

As the creator and administrator of this relief fund, I have the sole power and authority to reserve grants for small businesses.

Again, we estimate the grants will be gone within hours of being open for applications. A reservation gaurantees you a $15,000 grant and you don't have to worry about missing the short window to submit an application.

If you want to purchase a reservation, click here to purchase your reservation for $1200. For all reservation holders, I will send you a link to the application as soon as the relief fund is open for applications, which is early next month.

Once the relief fund is open for applications, your reservation holds your $15,000 grant for 7 days. If you have a reservation you are guaranteed to be awarded the $15,000 grant as long as you submit your application within the first 7 days of the relief fund being open for applications.

Grants will be dispersed via direct deposit beginning two weeks after the relief fund is open for applications. Everyone that is awarded a grant will

receive an email that instructs you to be on the look out for a direct deposit at your bank.

If you want to purchase a reservation and lock in your $15,000 grant, click here to purchase a reservation for $1200. Again, we estimate the grants will be gone within hours of being open for applications. A reservation locks in your grant and you don't have to worry about missing the short window to submit an application.

When purchasing a reservation, be sure to submit your primary email address so you don't miss our email alerting you that the relief fund is now open for applications.

# Click Here to purchase a reservation now

If you have questions, you can email me at brandon@lewisrevenuegroup.com

P.S. I will be providing reservations to only a small number of companies. As soon as reservations are gone, the opportunity to purchase a reservation will be removed.

Case 1:20-mj-00166-JLW    Document 1    Filed 06/23/20    Page 51 of 57

# Contact Us

**Email:** info@lewisrevenuegroup.com

**Phone:** 1 (888) 221-9073

**Address:** 3859 Battleground Ave, Suite 206, Greensboro, NC 27410

© 2020 Lewis Revenue Group - All rights reserved.

Case 1:20-mj-00166-JLW   Document 1   Filed 06/23/20   Page 52 of 57

# EXHIBIT 2



Lewis Revenue Group

Reservation for COVID-19 Relief Grant

$1,200.00

G Pay

Email

Full name

Credit card

Card number          MM/YY  CVV  ZIP

Pay

Secure checkout powered by Square

# EXHIBIT 3



**AmericanRelief.org**

# American Relief Fund

$5,000 grants for every American affected by COVID-19 (until funds run out). Funded by franchisees of America's largest corporations.

**Learn More**   **Begin Application**

## Funded by Franchisees of America's Largest Corporations

   

   

## A Few Words From Some of Our Funding Partners

*I encourage everyone to apply for the American Relief Grant. I am happy to be part of the American Relief Grant program, a program that does not rely on taxpayer's money. We are coming together to do our part to help you get through this pandemic."*

KRISTI MILLER, SUBWAY OWNER

*I'm glad I was contacted to help fund the American Relief Fund. If you are in need of relief funds, I recommend you apply as soon as you can."*

SAM GERBER, MCDONALD'S OWNER

## Frequently Asked Questions



| 1 | Who is eligible for the American Relief Grant? |
| 2 | How much is the American Relief Grant? |
| 3 | How do you decide who is awarded the American Relief Grant? |
| 4 | If I am awarded the American Relief Grant, how do I receive the funds? |
| 5 | How long will you be giving away $5,000 American Relief Grants? |
| 6 | Does the American Relief Grant have to be paid back? |
| | No, the American Relief Grant does not have to be paid back. |
| 7 | After I apply will you notify me if I am awarded or denied the American Relief Grant? |
| 8 | How long does it take to be notified if I was awarded or denied the American Relief Grant? |
| 9 | After I apply, how do I check my current status? |
| 10 | Can business owners apply for the American Relief Grant? |
| 11 | Once I have been awarded the American Relief Grant, how long does it take for my check to arrive? |
| 12 | Are there any restrictions on how the funds can be used? |
| 13 | What if I make a mistake on the application? Can I re-apply? |
| 14 | Can I receive more than one American Relief Grant? |
| 15 | How do I apply? |
| 16 | If I have questions, how do I contact you? |

© Copyright 2020 AmericanRelief.org